ENTERTAINMENT SOFTWARE
ASSOCIATION, et al.

v.

Charles C. FOTI, Jr., et al.

No. 06–431–JJB–CN.

United States District Court,
M.D. Louisiana.

Aug. 24, 2006.

James A. Brown, George Denegre, Jr.,
Liskow & Lewis, New Orleans, LA, Kath-

erine A. Fallow, Paul M. Smith, Jenner & Block, South Washington, DC, for Entertainment Software Association, et al.

David Glen Sanders, Burton P. Guidry, Patricia Hill Wilton, Louisiana Department of Justice, Baton Rouge, LA, for Charles C. Foti, Jr., et al.

Doug Moreau, Baton Rouge, LA, pro se.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO DISMISS

BRADY, District Judge.

This matter is before the court on a motion for preliminary injunction filed by plaintiffs. Additionally pending is a motion by defendants to dismiss brought under Fed. Rule Civ. P. 12(b)(2) and (6). Several briefs have been filed and have been duly considered by the court. Subject matter jurisdiction is based upon 28 U.S.C. § 1331 and § 1343(a)(3).

### BACKGROUND

On June 15, 2006, the Governor of Louisiana signed into law Act 441 of the 2006 regular session (hereinafter referred to as "the Act"). Under the provisions of the Act, its terms became effective upon the signature of the Governor. The Act was codified as La. R.S.14:91.14 (the "Statute") with the purpose of prohibiting and criminalizing the sale, lease, or rental of video or computer games that appeal to a minor's morbid interest in violence. The Act is attached hereto as Appendix "A."

On June 16, 2006, Entertainment Software Association ("ESA") and Entertainment Merchants Association ("EMA") brought this action pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief against enforcement of the Statute. The plaintiffs are trade associations whose members include companies that create, publish, manufacture, distribute, sell or rent video or computer games to the public. The named defendants are Charles C. Foti, in his capacity as the Louisiana Attorney General, and Doug Moreau, as District Attorney for the 19th Judicial District (East Baton Rouge Parish), and as representative of a class of all 41 district attorneys in the State of Louisiana.

The plaintiffs allege that the Statute is unconstitutional in that it significantly infringes upon their First Amendment rights of free expression, is void for vagueness and violates the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs have requested that this court issue a temporary restraining order, a preliminary injunction and a permanent injunction enjoining the defendants from enforcing or directing the enforcement of the Statute in any respect.

On June 16, 2006, this court issued a temporary restraining order. On June 30, 2006, the court held an evidentiary hearing on the request for a preliminary injunction. For oral reasons assigned at that time, the court denied the motion to dismiss in part. The court supplements its reasons herewith.[1]

### I. Motion to Dismiss

The defendants[2] urge the court to dismiss this proceeding on the grounds that the complaint does not present a justifiable

---

[1] At the hearing, the court denied defendants request for abstention under the *Pullman* doctrine and rejected defendants contention that there is no justiciable "case or controversy." The court reserved ruling on two other issues raised by defendants-whether Charles C. Foti, Jr. should be dismissed as a party defendant and whether this matter could proceed against Mr. Moreau as representative of a class of all 41 district attorneys in this State.

[2] The motion to dismiss was filed by the Attorney General but it was "adopted" by District Attorney Moreau. Transcript of Preliminary Injunction Hearing, p. 3.

"case or controversy" and thus "does not comport with the requirement of Article III of the United States Constitution." A second reason given by the defendants for dismissal of the complaint is that this court should abstain under the *Pullman* doctrine.

## A. Abstention under *Pullman* Doctrine

■ The *Pullman* doctrine originated in *Railroad Commission of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and has generally been viewed as calling for abstention by a federal court in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by state court determination of pertinent state law. *Palmer v. Jackson*, 617 F.2d 424 (5th Cir.1980).

*Pullman* abstention is appropriate when the case involves:

(1) A federal constitutional challenge to state action and,

(2) An unclear or uncertain issue of state law that, if resolved, would make it unnecessary for the federal court to rule on the federal constitutional question.

*Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Committee, of State Bar of Texas*, 283 F.3d 650, 653 (5th Cir.2002).

Here, the first requirement is clearly met. This action is a direct challenge to state action based on alleged deprivation of rights protected by the federal constitution. The second requirement is more problematic, however, and is not met. As explained below, there is no issue of state law that is "unclear;" and the plaintiffs have a strong likelihood of success on the merits of their claims that the Statute is unconstitutional.

Under the circumstances, this court would be derelict in abstaining. The case

law and learned treatises posit that *Pullman* abstention is rarely appropriate in cases based on the First Amendment because "the delay that results from abstention will itself chill the exercise of the rights that the plaintiffs seek to protect by suit." *Porter v. Jones*, 319 F.3d 483, 486–487 (9th Cir.2003). 17A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4242. Consequently, the court holds that *Pullman* abstention is not appropriate in this case.

## B. Case or Controversy

■ The defendants additionally seek dismissal on the basis that there is no justiciable "case or controversy." The defendants assert that the plaintiffs have failed to allege that they intend to engage in conduct prohibited by the Statute and they have not shown a "credible threat" of prosecution.

This assertion is not supported by a reading of the complaint. In Paragraph 12 of their complaint the plaintiffs allege that their members "are subject to liability for disseminating [video games]" and that the Statute "will have an immediate and vast chilling effect upon constitutionally protected speech." Plaintiffs claim that "those who sell, rent, or permit to be sold or rented video games will, to avoid liability under the Act, refrain from offering for rental or sale a wide array of games, either to minors or to all customers." Additionally, in Paragraph 13 of the complaint, plaintiffs set forth a claim of "willing listeners" as the potential recipients of speech from plaintiffs' members.

Under either claim, the plaintiffs have sufficiently asserted potential harm to give them standing. The Supreme Court has held that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." [3]

**3.** *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62, 112 S.Ct. 2130, 119 L.Ed.2d 351

Moreover, at the hearing on the motion for preliminary injunction, the plaintiffs carried their burden of demonstrating standing with uncontradicted affidavits.

## C. Scope of Injunctive Relief

■ This leaves, however, the defendants' arguments relative to the scope of injunctive relief. In a nutshell, defendants contend that plaintiffs should have sued all of the district attorneys in the State of Louisiana and that, as things stand, injunctive relief is only properly entered against Mr. Moreau in his capacity as District Attorney for East Baton Rouge Parish.

Defendants contend that a pre-enforcement challenge can only be brought against the party (or parties) having enforcement powers. According to defendants, Louisiana's Constitution is unique, as it severely restricts the Attorney General's authority to prosecute criminal actions.[4] Consequently, the defendants contend that the Attorney General may not be enjoined and that, to obtain the injunctive relief plaintiffs seek, all of the district attorneys in this State must first be made defendants.

In response, plaintiffs rely on federal and state procedural rules[5] requiring notice to the Attorney General whenever a state statute is challenged on constitutional grounds. Plaintiffs argue that the notice requirements effectively make the Attorney General an indispensable party. Plaintiffs further contend that the fact that the Attorney General may indirectly become involved in state criminal prosecutions makes him a proper party defendant.

Having considered this matter, the court fails to find any support to plaintiffs' arguments in the jurisprudence. The procedural rules providing for notification of the

Attorney General do not make him an indispensable party. See, *Vallo v. Gayle Oil Co., Inc.*, 646 So.2d 859, 864 (La.1994) (discussing La.Code Civ. P. art. 1880). They simply require notification and allow the Attorney General to intervene (at his option) and to participate in a representative capacity.

As previously noted, the Louisiana Constitution restricts the Attorney General's role in criminal prosecutions. Unlike the district attorneys, he does not have original jurisdiction to prosecute criminal cases. He may assist in a criminal prosecution "upon written request of a district attorney." La. Const. Art. 4, § 8. Alternatively, he may institute, prosecute or intervene in a criminal case "for cause, when authorized by the court" having original jurisdiction. Id. Consequently, any involvement the Attorney General might have in prosecuting cases under the Statute is indirect and remote.

The Fifth Circuit has held that, for purposes of enjoining unconstitutional acts, a state official is entitled to 11th Amendment immunity unless the plaintiff can establish "some connection between [him and] enforcement of the act." See, *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir.2001). While enforcement power may be "found implicitly" in state law other than the challenged statute, it may not be implied from the Attorney General's general duty to faithfully execute state law. *Okpalobi*, 244 F.3d at 419. In this case, plaintiffs have failed to demonstrate that there is a sufficient connection between the Attorney General and his possible enforcement of the Act for the court to adjudicate the claim against the Attorney General. Hence, the court agrees that the Attorney General is entitled to be dismissed as a

(1992).

4. La. Const. Art. 4, § 8.

5. Fed.R.Civ.P. 24(c); 28 U.S.C. § 2403; La. C.C.P. art. 1880.

party defendant for purposes of injunctive relief.

■ On the other hand, there is no dispute that District Attorney Moreau is responsible for enforcing the laws in East Baton Rouge Parish. As previously noted, the plaintiffs have demonstrated that there is a credible threat of prosecution by Mr. Moreau to establish a case or controversy between them. The question in this instance turns on whether plaintiffs are entitled to a preliminary injunction against Mr. Moreau in his capacity as representative of a defendant class of district attorneys statewide.

This request has been troublesome to the court inasmuch as plaintiffs did not file a motion for class certification with their motion for preliminary injunction. Even if the court were to allow plaintiffs to proceed without the formality of a written motion, there has been no noticed hearing [6] on the issue of class certification.

In cases reviewed by the court, a motion for class certification was made either prior to, or along with, the motion for injunctive relief.[7] E.g., *Baker v. Wade*, 769 F.2d 289, 294 (5th Cir.1985), overruled on other grounds by *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (class certified prior to the court rendering declaratory and injunctive relief); *Follette v. Vitanza*, 658 F.Supp. 492 (N.D.N.Y. 1987), modified on other grounds, 658 F.Supp. 514 (N.D.N.Y.1987) (motion for class certification brought with motion for summary judgment); *Musto v. American General Corp.*, 615 F.Supp. 1483 (M.D.Tenn.1985), reversed by 861 F.2d 897 (6th Cir.1988) (holding consolidated hearing on class certification and preliminary injunction); *Harris v. Graddick*, 593 F.Supp. 128 (M.D.Ala.1984) (provisionally certifying a defendant class in connection with issuing a preliminary injunction); *Clean–Up '84 v. Heinrich*, 582 F.Supp. 125 (M.D.Fla.1984) (motion to certify defendant class of sheriffs granted "for narrow purpose of effectuating preliminary injunction").

Plaintiffs cite no authority for issuing preliminary injunctive relief against a defendant class without an accompanying motion for class certification. Under the circumstances, the court declines to enter preliminary injunctive relief against anyone other than Mr. Moreau in his capacity as District Attorney for the 19th Judicial District. As provided in Rule 65(d), the preliminary injunction will extend to Mr. Moreau's "officers, agents, servants, employees, and attorneys, and . . . those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

While notice is not mandated in class certifications under Rule 23(b)(2), the court "may direct appropriate notice to the class." Rule 23(c)(2)(A). The court expects the plaintiffs to bring a motion for summary judgment shortly. Plaintiffs are directed to additionally file a motion for class certification and to personally notify by mail all of the district attorneys in Louisiana of this action. While notice is not required, the court feels that it would

---

6. This issue was touched on briefly at the hearing for preliminary injunction. When questioned by the court, plaintiffs merely argued that all of the requirements for class certification have been alleged and are met as a matter of law. Mr. Moreau simply responded that "numerosity" is not met as there are only 41 district attorneys in this state and that they should all have the opportunity to present their "different perspectives" on the issues. There was no advance briefing on this issue by the parties. The merits were not advanced to the hearing on the motion for preliminary injunction.

7. Many of the cases cited by plaintiffs do not even appear to involve a request for preliminary injunctive relief.

not be an onerous or time consuming task in this case.

For these reasons, along with those previously stated at the hearing, the court grants the motion to dismiss the claims against the Attorney General as a party defendant on the claims for injunctive relief. He will remain a party to the plaintiffs' request for a declaratory judgment. The court additionally denies the request to extend the preliminary injunction to Mr. Moreau in his capacity as representative of a defendant class. The court denies the motion to dismiss in all other respects.

## II. Motion for Preliminary Injunction

Section 91.14(A) of the Louisiana Revised Statutes criminalizes the sale or rental of certain "interactive video or computer games" as defined by the Statute to anyone under the age of 18 in Louisiana. A person who violates the Statute "shall be fined not less than one hundred dollars nor more than two thousand dollars or imprisoned, with or without hard labor, for not more than one year, or both." La. R.S. 14:91.14(B).

The video games proscribed by the Statute are those that meet all of the following criteria:

(1) The average person, applying contemporary community standards, would find that the video or computer game, taken as a whole, appeals to the minor's morbid interest in violence.

(2) The game depicts violence in a manner patently offensive to prevailing standards in the adult community with respect to what is suitable for minors.

(3) The game, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

La. R.S. 14:91.14(A).

The Legislature's stated purposes for restricting such video games are: "that children are the most precious resource of this state and they are worthy of special protection from their government" and that the State of Louisiana has an interest in protecting minors from "physical, psychological, and financial harm."

To obtain a preliminary injunction, the plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest. *See Walgreen Co. v. Hood,* 275 F.3d 475, 477 (5th Cir.2001).

### A. Likelihood of Success on the Merits

### 1. First Amendment Rights Violation

Plaintiffs argue that there is a substantial likelihood that they will succeed on their constitutional claims because the Statute, by criminalizing the sale or rental of prohibited video games to minors, constitutes a content-based invasion of First Amendment rights of both video game producers/retailers and willing listeners (viewers/players). In response, the State argues that the Statute regulates conduct, rather than speech, comparing the Statute's restrictions to laws restricting sales of tobacco or alcohol to minors.

### (a) Regulation of Speech or Conduct?

■ The State's argument overlooks a line of cases holding that video games are protected free speech. *Interactive Digital Software Ass'n v. St. Louis County, Mo.,* 329 F.3d 954, 958 (8th Cir.2003) ("*IDSA*") (noting that video games "are as much entitled to the protection of free speech as the best of literature") (quoting *Winters v. New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840 (1948)); *American Amusement Mach. Ass'n v. Kendrick,* 244 F.3d 572, 574 (7th Cir.), *cert. denied,* 534 U.S.

994, 122 S.Ct. 462, 151 L.Ed.2d 379 (2001) ("*AAMA*"); *Entertainment Software Ass'n v. Granholm*, 426 F.Supp.2d 646, 650–51 (E.D.Mich.2006) (noting that "video games contain creative, expressive free speech ... and are therefore protected by the First Amendment"); *Entertainment Software Ass'n v. Blagojevich*, 404 F.Supp.2d 1051, 1056 (N.D.Ill.2005) ("*Blagojevich*") (noting that video games are "one of the newest and most popular forms of artistic expression" and are "considered protected expression under the First Amendment"); *Video Software Dealers Ass'n v. Maleng*, 325 F.Supp.2d 1180, 1184–85 (W.D.Wash.2004) ("*Maleng*") (noting that video games "are expressive and qualify for the protections of the First Amendment"); *see James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir.2002), cert. denied, 537 U.S. 1159, 123 S.Ct. 967, 154 L.Ed.2d 893 (2003) (noting that First Amendment protects the communicative aspects of video games).

Indeed, it is the "expressive element" of video games that led to enactment of the Statute. As stated by the court in *Maleng*, "it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere." *Maleng*, 325 F.Supp.2d at 1184.

The fact that the Statute applies to video games that "depict violence" makes no difference as a matter of First Amendment scrutiny. Depictions of violence are entitled to full constitutional protection. *See IDSA*, 329 F.3d at 958 (strict scrutiny applies to content-based restrictions on "violent" video games); *AAMA*, 244 F.3d at 575–76 ("The notion of forbidding not violence itself, but pictures of violence, is a novelty."); *Maleng*, 325 F.Supp.2d at 1186 (same); *Eclipse Enterprises, Inc. v. Gulotta*, 134 F.3d 63, 66 (2nd Cir.1997) (declining to "expand" the "narrow categories of [unprotected] speech to include depictions

of violence" in trading cards). Indeed, the Supreme Court in connection with the regulation of magazines has stated that violent expression is "as much entitled to the protection of free speech as the best of literature." *Winters*, 333 U.S. at 510, 68 S.Ct. 665 (1948).

The State contends that a video game is different from all other forms of media because it provides "visual, auditory and other sensory feelings of feedback and encouragement, etc., when the viewer complies with instructions to do violence." This argument has been rejected many times as well. First Amendment protection is afforded other forms of media that have interactive aspects. As noted by Judge Posner in *AAMA*, movies, television and even photography all have interactive aspects. *AAMA*, 244 F.3d at 577. It is the interactive aspect of literature that makes it successful—"draw[ing] the reader into the story, mak[ing] him identify with the characters, invit[ing] him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own." *Id.* See also, *IDSA*, 329 F.3d at 957–58; *Granholm*, 426 F.Supp.2d at 651(finding video games have expressive elements that are inseparable "from their interactive functional elements" and accordingly both are protected by the First Amendment).

For the reasons stated above, the court concludes that the Statute regulates protected free speech.

**(b) Strict Scrutiny**

Because the Statute restricts protected expression based on its content, it is "presumptively invalid" and subject to strict scrutiny. See *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Plaintiffs argue that the State cannot satisfy its burden of es-

tablishing any of the prongs of the strict scrutiny standard.

██ Under the strict scrutiny standard, the State must (1) articulate a compelling state interest; (2) prove that the Statute actually serves that interest and is "necessary" to do so; and (3) show that the Statute is narrowly tailored and a material advancement of that interest. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664–65, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). The State "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664, 114 S.Ct. 2445.

### (i) Must Serve Compelling State Interest

██ As to the first prong, the State contends that the Statute serves two compelling state interests—preventing both "physical" and "psychological" harm to minors. Plaintiffs argue that neither of these purported interests satisfies the requirements of strict scrutiny.

There is no question that "curbing violent behavior" is an important societal interest. However, when it comes to regulating expression in order "to curb violent behavior," the State must satisfy the standard set forth in *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). *Granholm*, 426 F.Supp.2d at 653; *Blagojevich*, 404 F.Supp.2d at 1073; *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021–22 (5th Cir.1987).

Under *Brandenburg*, the government must prove that the targeted expression "is *directed* to inciting or producing *imminent* lawless action and is *likely* to incite or produce such action." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253, 122 S.Ct.

1389, 152 L.Ed.2d 403 (2002) (quoting *Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827) (emphasis added). As the Supreme Court has explained, "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft*, 535 U.S. at 253, 122 S.Ct. 1389. Thus, the government may not punish speakers based solely on a prediction or suspicion that their words will tend, in the aggregate, to encourage undesired behavior.

Also, plaintiffs correctly assert that the Statute cannot be defended on the grounds that it is designed to protect minors from some form of "psychological harm," as that amounts to nothing more than "impermissible thought control." The First Amendment forbids governmental restrictions on speech based on the provocative or persuasive effect of that speech on its audience. *See Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (striking ban on picketing near embassies where the purpose was to protect the emotions of those who reacted to the picket signs' message); *Texas v. Johnson*, 491 U.S. 397, 408–09, 109 S.Ct. 2533, 105 L.Ed.2d 342 (noting that interest in protecting bystanders from feeling offended or angry is not sufficient to justify ban on expression). As the Supreme Court has noted, "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Ashcroft*, 535 U.S. at 253, 122 S.Ct. 1389.

The government may not limit minors' exposure to creative works based on a general belief that they may be "psychologically harmful." *IDSA*, 329 F.3d at 959–960 ("[In no case] does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to governments to regulate what

minors read and view... [T]he government cannot silence protected speech by wrapping itself in the cloak of parental authority."); *Blagojevich*, 404 F.Supp.2d at 1076 (same); See *AAMA*, 244 F.3d at 577 (noting shielding children from "exposure to violent descriptions" might "leave them unequipped to cope with the world as we know it."). Therefore, the State may not restrict video game expression merely because it dislikes the way that expression shapes an individual's thoughts and attitudes. *See Blagojevich*, 404 F.Supp.2d at 1074 ("In this country, the State lacks the authority to ban protected speech on the ground that it affects the listener's or observer's thoughts and attitudes.").

Defendants contend that the legislative record contains social science evidence demonstrating that violent video games are harmful. It appears that much of the same evidence has been considered by numerous courts and in each case the connection was found to be tenuous and speculative. *See Entertainment Software Association v. Hatch*, 443 F.Supp.2d 1065 (D.Minn.2006) (finding that the State of Minnesota failed to show "a causal link between the playing of video games and any deleterious effect on the psychological, moral or ethical well-being of minors."); *IDSA*, 329 F.3d at 958; *Blagojevich*, 404 F.Supp.2d at 1073; *Granholm*, 426 F.Supp.2d at 652–3; *Video Software Dealers Ass'n v. Schwarzenegger*, 401 F.Supp.2d 1034, 1046 (N.D.Cal.2005); *Maleng*, 325 F.Supp.2d at 1188–89; *see also AAMA*, 244 F.3d at 576, 578–79.

The evidence that was submitted to the Legislature in connection with the bill that became the Statute is sparse and could hardly be called in any sense reliable. Much of the "evidence" presented consisted of newspaper articles on the evils of video games and several articles that relate information about studies on video games and violence or articles on the stud-ies themselves. None of these are conclusive, or otherwise support, the reasoning which the defendants put forth as the basis for the Legislature's enactment of the Statute.

For example, one article by Dr. Sonya Brady (Defs.Exh. "C") concludes that:

> ...More research is needed to see if play of violent videogames is linked with permissive attitudes towards substance use in other groups of people.

> In our article, we suggest that media violence may predispose adolescents and young adults towards greater engagement in general health risk behaviors and towards tension and conflict in their social interactions with others. We suggest that adolescents and young adults may benefit from media education campaigns.

Another article (Defs.Exh. "D") concerned brain studies of 38 teens. The teens who were studied were not playing video games; and, the study concluded that further studies must be done. Another (Defs.Exh. "F") was a program to encourage grade school children to reduce the amount of time they spend "watching television and playing video games" with the end to see if such a cut back makes them less aggressive. Most of the criticism by the conductors of this study was directed at the amount of time spent watching television, something the Statute does not address.

As stated above, all of the documents presented are similar in their conclusions. Such evidence has been rejected by other courts and this court reaches the same conclusion. In short, the State has not come forth with evidence that would satisfy the stringent *Brandenburg* standard. Even when provided more time, in view of the foregoing, it is unlikely that the State will be able to establish that any video games are directed towards inciting immi-

nent lawless action or that they are likely to cause such action. The court concludes that there is not substantial likelihood that the State will be able to produce "substantial evidence" of a compelling state interest.

### (ii) Must Advance State Interests and be Narrowly Tailored

Plaintiffs' next argument is that the Statute does not materially advance the State's interests and it is not narrowly tailored. The State argues that the Statute's prohibition is the least restrictive and most effective method of protecting the interests of the public and particularly minor children.

The State's argument is implausible. As plaintiffs indicate, violent video games are only "a tiny fraction of the media violence to which modern American children are exposed." *AAMA,* 244 F.3d at 579. But the Statute leaves these other media unaffected. Under the Statute, for example, a minor could be legally barred from buying or renting an "M"-rated video game containing violent content, but the same minor could legally buy or rent the movie or book on which the video game was based. Courts have noted that this type of facial underinclusiveness undermines the claim that the regulation materially advances its alleged interests. *See Florida Star v. B.J.F.,* 491 U.S. 524, 540, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989); *Blagojevich,* 404 F.Supp.2d at 1075 ("In fact, the underinclusiveness of this statute—given that violent images appear more accessible to unaccompanied minors in other media—indicates that regulating violent video games is not really intended to serve the proffered purpose"); *Granholm,* 426 F.Supp.2d at 654 (holding "singling out" the video game industry does not advance the State's alleged goals and therefore does not fulfill the strict scrutiny requirement).

Second, it appears that there are less restrictive alternatives which would achieve the State's goals. In order to meet the burden of demonstrating that the Statute is narrowly tailored, the State must show that a plausible, less restrictive alternative does not exist. *See U.S. v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). However, as plaintiffs indicate, such alternatives exist, including encouraging awareness of the voluntary ESRB video game rating system (which provides guidance to parents and other consumers), and the availability of parental controls that allow each household to determine which games their children can play. *See Id.,* at 824–25, 120 S.Ct. 1878 (holding that a court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act); *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 507–08, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an "educational campaign" or "counterspeech"); *Ashcroft,* 542 U.S. at 671–72, 124 S.Ct. 2783 (noting that rapid technological developments may create alternatives displacing the rationale for imposing speech restrictions).

In view of the foregoing, this Court concludes that plaintiffs have a likelihood of success on the merits of their claim that the Statute violates the First Amendment.

### (iii) Prior Restraint and Chilling Effect

■ The State argues that plaintiffs have failed to establish a substantial likelihood of success on the merits because plaintiffs' claims are premature, and the Statute has no impermissible chilling effect on protected free speech. These assertions are premised on the notion that the

Statute requires a judicial determination that a particular video games falls within its scope before a criminal prosecution can go forward. The State contends that because there is such a requirement there is no "prior restraint" on plaintiffs. Therefore, until such time as a declaratory judgment is rendered decreeing that a particular video game falls within the scope of the Statute, plaintiffs have nothing to enjoin and there is no chilling effect on protected free speech.

The State's assertions are meritless for the following reasons. First, nothing in the Statute's text provides for a preliminary judicial determination. All that it states is that a seller of games will be held to have violated the law when the "trier of fact determines" that a game distributed to a minor meets the statutory criteria. If the statute was intended to require such an advance determination, one would expect to find provisions setting forth who could initiate such a proceeding, where it would be filed, etc. On its face, the Statute merely requires that the "trier of fact" at the criminal trial make this determination in the course of its deliberation of the charges.

Second, the "harmful to minors" statute (which served as a model for the Statute at issue here) contains a similar provision. La. R.S.14:91.11(2) The "[m]aterial harmful to minors" statute is triggered "when the trier of fact determines" that the standard set forth in the statute is met.[8] The Statute at hand is triggered "if the trier of fact determines" that the requisite statutory criteria are met. La. R.S. 14:91.14(A). Yet, it does not appear that there have been any pre-prosecution determinations by "the trier of fact" under the "harmful to

minors" statute. *E.g., State v. Lisotta,* 712 So.2d 525, 527 (La.App.1998); *State v. Anderson,* 540 So.2d 974, 975 (La.App. 1989). There is no reason to think that the Statute at hand, using virtually identical language, should be interpreted any differently.[9]

Moreover, if the Statute is construed as requiring advance judicial determinations, this would cause further infringement of plaintiffs' constitutional rights. Plaintiffs' members might well be forced to litigate the Statute's application to video games (and the constitutionality thereof) on a case by case basis in multiple jurisdictions. There are potentially hundreds of games containing depictions of violence that some law enforcement official in some part of the State might consider to be subject to the Statute.

Absent an injunction, the Statute will have a substantial chilling effect on both video game developers and retailers, even pending the outcome of the State's proposed game-by-game judicial review. As plaintiffs contend, developers may refrain from including certain content in their games for fear that such content may trigger a judicial proceeding and/or finding that the game is covered. And retailers may decide not to stock games that might end up being restricted to minors on the basis that they will be limited in their ability to sell them once a judicial determination has been made.

The State suggests that this type of chilling effect should be allowed because plaintiffs' members are already "self-censoring" by utilizing the ESRB rating system. However, as plaintiffs correctly

---

8. That is, an average person applying contemporary community standards would find that the work or thing is presented in a manner to provoke or arouse lust, passion, or perversion or exploits sex.

9. Whether or not such a determination is made before criminal prosecution commences, the State is still suppressing speech based on the content of the speech—and that is unconstitutional.

point out, voluntary measures do not give the State licence to impose its own separate content-based restrictions, any more than the existence of MPAA movie ratings give the State license to restrict the viewing of certain films.

## 2. Vagueness

■ Plaintiffs argue that the Statute is unconstitutional on an independent grounds: vagueness. They assert that the Statute restricts a far broader range of expression than what the State seeks to regulate because several of its key terms have no clear meaning and it places the burden of compliance on game retailers.

The State contends that the Statute provides clear guidance to all affected parties. Again, the bulk of the State's arguments are premised on a statutory construction requiring a pre-prosecution, judicial determination. According to the State, such a declaratory judgment procedure would allow all affected parties to tailor their conduct accordingly essentially mooting any vagueness issues. For reasons previously stated, the court rejects this argument.

Additionally, the State argues that the Act was specifically drafted to surpass constitutional scrutiny and it is the most narrowly drawn statute of its kind to date. Plaintiffs obviously disagree. It is well settled that the Constitution demands that statutes be set forth with "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Such precision is essential to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The vagueness of a content-based regulation of speech, particularly one imposing criminal penalties, "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). While the statute may be aimed at protecting minors, it still must be clearly drawn with standards that are reasonably precise. *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir.1992) ("*Webster*").

In defining what is a prohibited video game, the Statute adopts a three-part test, which includes the following crucial terms: "the minor's morbid interest in violence," depictions of violence that are "patently offensive to prevailing standards in the adult community with respect to what is suitable for minors," and games which lack "serious literary, artistic, political, or scientific value for minors." La. R.S. 14:91.14(A). The Statute doe not define any of these terms.

Courts have declared several statutes, using parallel language, to be unconstitutionally vague. *E.g., Webster*, 968 F.2d 684; *Granholm*, 426 F.Supp.2d 646. For example, in *Webster*, the Eighth Circuit affirmed the district court's holding that a Missouri statute (prohibiting rental or sale to minors of videos depicting violence and requiring dealers to display or maintain such videos in separate areas within their stores) is unconstitutionally vague on its face. 968 F.2d 684. The Missouri statute adopted a three-part test (identical to that in the Statute at hand) to clarify what was a prohibited violent video game. *Id*, at 687. The district court held that the statute lacked narrowly drawn, reasonable and definite standards, noting the absence of any definition of "violence" and the use of elusive terms such as "morbid interest in violence." *Id.* at 690. The court then concluded that the statute was facially unconstitutional on due process grounds because "people of common intelligence,

whether prosecutors or video dealers, must guess at the meaning of the statute." *Id.*

In *Granholm,* the court struck down for unconstitutional vagueness a Michigan penal statute using parallel language prohibiting "violent video games." 426 F.Supp.2d 646. The court held that "the lack of precision among these definitions will subject Michigan retailers to steep civil and criminal liability if they guess wrongly about what games the Act covers." *Id,* at 656. The court further rejected the state's argument that it can regulate any speech "harmful to minors." While a "harmful to minors" analysis has been used by the Supreme Court to uphold regulation of obscene material harmful to minors,[10] this does not mean that the same considerations apply in the context of "violent video games." *Granholm,* 426 F.Supp.2d at 655–56.[11]

Like both the Missouri and Michigan statutes, the Statute fails to provide specific definitions of prohibited conduct: many of its terms, such as "morbid interest," have no clear meaning; and there is no explanation of crucial terms such as "violence." Consequently, video producers and retailers will be forced to guess at the meaning and scope of the Statute, and may "respond by either self censoring or otherwise restricting access to any potentially offending video game title." *Granholm,* 426 F.Supp.2d at 656; *see also Blagojevich,* 404 F.Supp.2d at 1077.

## B. Other Prerequisites for Preliminary Injunction

Plaintiffs correctly assert that the other prerequisites for a preliminary injunction are met here as well. First, plaintiffs contend that both their members and willing listeners will suffer irreparable harm if the Statute goes into effect. It is undisputed that the loss of First Amendment freedoms in and of itself constitutes irreparable harm. The State argues that plaintiffs cannot show irreparable harm as no harm occurs until such time as a judicial determination is rendered declaring a particular video game within the ambit of the Statute. The court disagrees.

The Supreme Court has made clear that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981). In the First Amendment context, irreparable injury "stems from the intangible nature of the benefits flowing from the exercise of those rights and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.,* 163 F.3d 341, 363 (6th Cir.1998) (internal quotation marks omitted).

Second, plaintiffs assert that granting the preliminary injunction will not disserve the public interest and the threatened injury to plaintiffs outweighs the threatened injury to defendants. The State asserts that enjoining enforcement of the Statute will completely frustrate the compelling public interest of the citizens of Louisiana as expressed by their Legislature. The State also argues that since plaintiffs face no imminent threat, the threatened injury

---

**10.** *Ginsberg v. State of N.Y.,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

**11.** In *Maleng,* 325 F.Supp.2d at 1185–86, the court went even further, stating that expression is not unprotected simply because it might be "harmful to minors." The speech must be "obscene as to youths" or subject to "some other legitimate proscription."

to the plaintiffs does not overcome the State's interest in protecting minors.

Again, the State's argument lacks merit. As previously noted, plaintiffs have a substantial likelihood of success of proving a First Amendment violation. Therefore, the public interest would be harmed if the Act were allowed to go into effect. *See Wexler v. City of New Orleans,* 267 F.Supp.2d, 559, 568–69 (E.D.La.2003) ("[t]he public interest is best served by enjoining the effect of any ordinance which limits potentially constitutionally protected expression until it can be conclusively determined that the ordinance withstands constitutional scrutiny"). By contrast, "there can be no irreparable harm to a [government] when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner v. Village of Washington Park,* 378 F.3d 613, 620 (7th Cir.2004) (quoting *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998)).

■ In conclusion, it is the finding of this court that the plaintiffs have satisfied all the prerequisites for granting an preliminary injunction. Plaintiffs are likely to succeed on the merits of their claims under the First and Fourteenth Amendments. The loss of constitutionally protected freedoms in and of itself constitutes irreparable harm. It is undoubtedly in the public interest to protect First Amendment liberties. Therefore, granting the preliminary injunction will not disserve the public interest and the threaten injury to plaintiffs outweighs the threatened injury to defendants.

Accordingly, the motion by defendants to dismiss (doc. 19) is hereby GRANTED to the extent that the Attorney General is dismissed as a party defendant to injunctive relief and preliminary injunctive relief will not be entered against Doug Moreau as representative of the proposed defendant class. In all other respects, the motion to dismiss is DENIED. The motion (doc. no. 1) for preliminary injunction is hereby GRANTED. Counsel for plaintiffs is instructed to submit an appropriate order for the court's signature, after having obtained approval as to form from opposing counsel. Nothing herein affects the declaratory judgment request of the complaint.

## Appendix "A"

### 2006 La. Sess. Law Serv. Act 441 (H.B.1381) (WEST)

#### 1.

AN ACT to enact R.S. 14:91.14, relative to offenses affecting the health and morals of minors; to provide with respect to the sale, exhibition, or distribution of material harmful to minors; to provide for definitions; to create the crime of prohibited sales of computer or video games to minors; to provide for definitions; to provide for penalties; and to provide for related matters.

Be it enacted by the Legislature of Louisiana:

<<Note: LA R.S. 14:91.14>>

Section 1. The legislature finds that children are the most precious resource of this state and that they are worthy of special protection from their government. The laws of Louisiana contain extensive provisions which afford children additional protection by prohibiting them from voting, entering into marriage, purchasing or publicly possessing alcoholic beverages, purchasing tobacco products, participating in gaming activities, entering into contracts, and purchasing harmful materials. The legislature has also enacted wholly distinct provisions for identifying children who are in need of care and establishing a means to provide those children with appropriate

services. These laws demonstrate Louisiana's commitment to protect its citizens from physical, psychological, and financial harm during the time in which they are particularly vulnerable due to their age and immaturity. In enacting this Act, the Louisiana Legislature clearly demonstrates the state's compelling governmental interest in protecting children and that it seeks to incorporate the extensive protections otherwise afforded to minors in this state to the area of interactive video and computer games.

Section 2. R.S. 14:91.14 is hereby enacted to read as follows:

<<LA R.S. 14:91.14 >>

§ 91.14. Prohibited sales of video or computer games to minors

A. An interactive video or computer game shall not be sold, leased, or rented to a minor if the trier of fact determines all of the following:

(1) The average person, applying contemporary community standards, would find that the video or computer game, taken as a whole, appeals to the minor's morbid interest in violence.

(2) The game depicts violence in a manner patently offensive to prevailing standards in the adult community with respect to what is suitable for minors.

(3) The game, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

B. For the purposes of this Section:

(1) "Interactive video or computer game" means an object or device that stores recorded data or instructions, receives data or instructions generated by a person who uses it and by processing the data or instructions, creates an interactive game capable of being played or viewed on or through a computer, gaming system, console, or other technology.

(2) "Computer" includes an electronic, magnetic, optical, or other high-speed data processing device or system performing logical, arithmetic, and storage functions and includes any property, data storage facility, or communications facility directly related to or operating in conjunction with such device or system. "Computer" shall not include an automated typewriter or typesetter, a machine designed solely for word processing, or a portable hand-held calculator, nor shall "computer" include any other device which might contain components similar to those in computers but in which the components have the sole function of controlling the device for the single purpose for which the device is intended.

(3) "Minor" means any person under the age of eighteen years.

C. Whoever is found guilty of violating the provisions of this Section shall be fined not less than one hundred dollars nor more than two thousand dollars or imprisoned, with or without hard labor, for not more than one year, or both.

Section 3. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval.

Approved June 15, 2006.

LA LEGIS 441 (2006)

END OF DOCUMENT

LA LEGIS 441 (2006)